All right, case number three for this morning is Linda Green v. Carolyn Colvin, Acting Commissioner, 1421-36. Mr. Forbes. May it please the Court, I'm Randall Forbes. I represent the claimant, Linda Green. I did not represent her at the Social Security Administrative Law Judge hearing or at the first round of briefing, but I entered this case at the objection to her claim. So we're talking about a very short period of time, are we not? Her alleged onset date is June 30, 2008, and her date last insured is just March 2009, am I correct? Yes, there is a short period of time in which disability has to be proven in order for her to access DIB benefits. But if she does prove that she became disabled within that little nine-month or whatever it is window, then her disability benefits would continue? Yes, unless a judge made a finding that they did not last for 12 months. Sure, of course, factually they might not. But that's correct, Your Honor. Shall I proceed? Please. Thank you. I want to spend most of my time on the handling and fingering issue and on the migraine issue, even though the thyroiditis issue and the thyroid cancer issue just kind of seem like they're the major factors in the case. And they're very important. But the thyroid cancer doesn't show up until after March 31, 2009. That's correct. The administrative law judge thought that there was an insufficient factual basis in the record to show that she was disabled, whether it was a thyroid cancer or whether it was just a lesser thyroid problem, but that she wasn't disabled from it by March 31. And regarding the combination of her thyroiditis and lymphoma, haven't both of those conditions been effectively controlled? She's been very fortunate in that regard. It's possible that she's all better now, but that's not part of the record. And I don't really know how she's doing now. Well, yeah, but if you look at what each of the doctors wrote, they… There was what would be regarded as a successful result of the thyroid lymphoma after a very rough treatment course. I really only wanted to make one comment about the thyroiditis lymphoma issue. And that is she had thyroiditis before the date last insured, Hashimoto's, and she had it concurrently with the thyroid lymphoma afterwards. So the continuity can be established by the Hashimoto's, even though the… But where is the concrete medical expert testimony that says that? You know, I understand we can go to WebMD and so on, whatever website you like. But I didn't find a physician of any type, treating, state, saying that the thyroiditis sort of had embedded in it enough of a lymphoma that she was actually disabled by March 31st. I agree with you there, Your Honor, and that's why I didn't phrase what I just… But you get to your other points then. Okay, yeah. The main point is on the thyroiditis, is that her symptoms and her testimony were consistent with the Hashimoto's at the date last insured period. Okay. Okay, done. So you wanted to talk about… The handling and figuring issues are supported by testimony and objective medical testing, and yet they appear essentially absent from the residual functional capacity. And they would be material to whether she could do her past relevant work. So what's your best evidence on… Is it from the rheumatologist? Where are you providing? The best evidence on the fingering issues is from the rheumatologist and the statement about the finger joints and the objective testing in relation to the, I think, the ANAs. But didn't she have… I mean, Dr. Stack, for example, is treating her for the arthritis as early as 2007, and at that point she's still running these three florist shops. Is that right? I think the extent of her work is… I think the best statement on that is Dr. Stack himself, where he mentions that she had substantially reduced her activity in that regard. She's self-employed. It's just surmising, I think, that she tried to hang on to this job that she created for as long as she possibly could, including showing up sick. And there's testimony that she would just deal with her medical problems while she was on the job, rest when she had to, et cetera. It's part of why I think the onset date here is so late. But she has employees. She owns three shops. She's not racing around to three different shops doing it all by herself. She does have employees, yes. The headache issue, I think, is even stronger than the handling and fingering issue. There are even restrictions mentioned, phonophobia, photophobia. And there is expert testimony tying it back to the relevant period before the date last insured. Not only that, but… Remind me, I thought she was also getting medication to handle the migraines. Well, yeah, after the date last insured, when she saw the neurologist. He prescribed a Pyramate. And there is a comment that said that it was well controlled. But this is right during the period just before the diagnosis of the cancer. And so I'm not sure that that comment's entitled to all that much weight because, you know, she's got migraine headaches. And then she has tumors in her neck. And the neurologist references the long history of headaches. And I don't think that the ALJ is actually reading the MRI. Well, I'm not sure that the MRI evidence was mentioned. But at some point, one of the subsequent reviewers, whether it's a magistrate or the district court judge, I think mentioned that the MRI was normal, or that there were normal findings. Well, this wasn't a normal MRI. It had the hyperintensities that show up with all sorts of really bad things. And they're all mentioned in the brief. And so the point is that there's a lot here from all sorts of different directions. But this case could be one on the headaches alone. And sometimes I think we hyper-divide the impairments. And part of that's the state of the science that we have and the way everything's specialized. But, you know, thyroid problems, if you view that as the impairment, then there is a continuity even from before the day last insured until the end. The claimant knew something was wrong. And she testified that something was wrong. And her doctors and science eventually found it. Okay. Well, thank you very much. Mr. Denke. May it please the Court, Joshua Denke for the appellee. The record does support the ALJ's findings that Ms. Green could perform light work in this case. And the ALJ carefully considered all the relative evidence, considered these impairments in combination. That language is clear in the ALJ's decision. Well, this case stops at step four, right? I'm sorry? This case stopped at step four. The ALJ found that she could do her previous work. Yes, Your Honor. Okay. Or at least as of March 31st, 2009. Right. As opposed to being more accurate, she could still do that work. Right. Now the appellant references these several impairments that she alleges were not adequately discussed by the ALJ. As this Court pointed out, most of the relevant evidence that the appellant points to does occur well before the alleged onset date of disability and after the date last insured. Well, I would really just like to note that although the ALJ did give substantive reasons to support her finding, I just wonder how do we go about stopping the boilerplate credibility language from continuing to appear in the ALJ decisions? Well, Your Honor, this Court has probably not yet seen some of the changes that I have started noticing in district court cases. There is summary language which is helpful to claimants to understand some of it. But this is not helpful at all. This is the December 6, 2011 ALJ decision, and we had been criticizing this language by that time. And I wondered also whether we just have to reverse all of these until the ALJs get it, or what are we supposed to do? Well, Your Honor, the message has been clear about that. This Court has also held that it does have a problem with that boilerplate language, but it has also held that we're going to look at the substance of that credibility finding. So what we do in our minds is we take a large black pencil and we excise that language. It actually detracts, but it's like a search warrant. You know, you take out the offending language and then you ask, is there something here that satisfies the statutory standards? And I think in this case, the ALJ clearly does have that in here. The ALJ points to routine treatment with minor complaints during the relevant time period in particular. Now, she does report headaches by 2007. She's telling people she has headaches, and so I think there is some evidence of the headaches during the relevant period. In 2007, which is prior to the relevant time period, during the relevant time period the treatment notes are very routine. There is very little mention of things such as headaches or a lot of the other impairments that Appellant alleges here. When Appellant claims that there are symptoms that come out during this time period, Appellant seems to be relying solely on the testimony of the claimant as opposed to actual treatment notes or doctor's opinions. And Appellant, again, does not dispute the fact that the only doctor's opinions out here that really look at that relevant time period, they actually say there's no severe impairment at all. The ALJ did give the benefit of the doubt on that point, but those opinions are uncontroverted. I'm sorry. I'm concerned about the lack of discussion of the MRIs. Could you address that? Sure. The ALJ did mention the MRIs, did not discuss it in great detail. But the fact that there were MRIs, first of all, this was after the date last insured. But you can infer, I mean, some physical conditions don't just pop up overnight. So if you have an MRI after the date last insured, there's a very reasonable inference that you are looking at a picture of an organ, the brain or whatever, that has been affected for a while. Absolutely, and what the ALJ did is looked at the evidence right before that MRI, during the relevant time period, and there just isn't evidence there that supports this. And the ALJ also looked at other evidence that included that the headaches were controlled with medication. The fact that there was an MRI that was after the date last insured doesn't just pop up, but if the appellant was, in fact, experiencing disabling symptoms from June of 2008 through April of 2009, it's reasonable for the ALJ to assert that that would be reflected, those symptoms would be reflected in treatment notes, in complaints, in something else of that nature. And that just is not present in this case. Now, with respect to some of the upper extremity problems that appellant talked about. Well, she does seem to have a real problem with arthritis. Absolutely, absolutely, and the ALJ did limit to light work. As a result, again, here we're talking about the vast majority of this evidence is cited before the alleged onset date. The ALJ did discuss some of that evidence. The ALJ did acknowledge exams showing decreased range of motion and positive impingement tests, but the ALJ did also note that there were- And thinking that she can still be a florist when her finger joints are swollen and she's having problems manipulating? Well, the ALJ accurately pointed to x-rays that showed no abnormalities here. The ALJ emphasized the fact that despite reports of some pain in the upper extremities, even before the alleged onset date, around, I think it was April 2008, that the appellant did not receive significant treatment for these impairments. Would you concede that there are an awful lot of illnesses, diseases? I mean, it's a lot for one person, is it not? There certainly are. I mean, whether, you know, this gets in some of the point about thyroiditis and some of the different diagnoses here and the confusion that the ALJ is tasked with looking at the record as a whole, the combination of impairments, whether it's two, whether it's 12, whether it's 20. And the ALJ did that here. The appellant engages in conjecture in saying these symptoms worsened or these symptoms got worse. Once again, the ALJ is not tasked with speculating. The ALJ is tasked with looking at what the record actually says. And once again, we have a record that really it shows some treatment, and it certainly shows some treatment. It shows severe impairments. The ALJ acknowledged all of that. It showed that there were severe and limiting impairments. But the fact of the matter is, during the relevant time period and around the relevant time period, the evidence is not there. There were a number of normal examinations and normal tests showing very few abnormalities. There was... And there's only so much you can do with these autoimmune diseases. I mean, you can give people steroid shots. She has some. She declines others. You can address the pain in some way. Some of her polyarthralgia is non-inflammatory, so it doesn't help to treat it as an inflammatory disease if it isn't. But the autoimmune family of diseases, which she seems to have a lot of, are notoriously difficult to treat. They are, and there's obviously a full range of patients, claimants who have these and other impairments. There's varying degrees of severity. Just because someone has it does not mean they are able to meet a high standard of social security disability. And in this case, there's just not the evidence there. There's not evidence that shows that she was consistently seeking out treatment and reporting these symptoms during the alleged time period or even right around it. We just don't have that evidence. Just like Judge Wood, I was taken with the idea that she could continue to be a florist. I mean, they pick up such heavy buckets filled with flowers and heavy plants and move around constantly. It's a very physical job, it seems to me. It certainly can be, and as the court pointed out, the appellant here did have employees. So this isn't the case of an individual who is the sole employee and owner of a business and must do everything. And you had this inadequate, as I'm remembering correctly, comment from the vocational expert. As performed, she was doing it at a medium exertional level. And so there is actually, maybe it's not really a Step 4 finding because she couldn't continue at the medium level. She had to ratchet back to the light level. And there, there's a lot of fine manipulation, trimming little things off. Well, Your Honor, it's still a Step 4. The ALJ is allowed a Step 4 to find as either actually performed or as generally performed in the national economy. And the vocational expert did testify, citing to the Dictionary of Occupational Titles, that this was light as actually, as generally performed. Right. You know, and the DOT, honestly, it's like something that belongs in the Smithsonian. It's just so out of date. But anyway, I acknowledge that it's one of the albatrosses you have to defend. And I think in this case, at least, there's not a lot of worry about the DOT as it relates to the position of florist. I have heard that concern before with certain positions. I don't think that concern is as much regarding florists. And so, at any rate, the ALJ did make that finding at Step 4 as it's generally performed, and that was not challenged. Are there no other questions? I'd ask that the Court affirm. Thank you. All right. Thank you. Mr. Forbes, I think you have one minute. That's all I'll need, Your Honor. I'm just going to address my comments to the boilerplate issue, and I call it the Martinez issues. It would promote judicial economy if you would just draw the line. Almost every other case that I get ready before district court has it in there. And it gives life to some appeals that maybe didn't have a lot of life in them. And so that's one reason to do it. The other reason is legitimacy. Our whole judicial system and our government, in one sense, is in a crisis of legitimacy. People are having doubts. Some of the doubts are valid. Some aren't. But the point is this boilerplate language makes the ALJ decisions look illegitimate. It looks like they backed into them. So make my job easier. I won't have to do many cases. All right. Well, thank you very much, Mr. Forbes. Thank you, Mr. Denke. We will take the case under advisement.